MATTHEW J. LOMBARD  (SBN 239910)
LAW OFFICES OF MATTHEW J. LOMBARD
11400 W. Olympic Blvd., Suite 1500
Los Angeles, California 90064
Telephone (424) 371-5930
Facsimile (310) 392-9029
Email: mlombard@lombardlaw.net

Attorney for Defendant
JOSE GUADALUPE VALENZUELA


UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| JOSE GUADALUPE VALENZUELA, ) | Case No. CR 77-01047-RG-1 |
| ) | |
| Petitioner, ) | **SUPPLEMENT TO DEFENDANT'S REQUEST FOR ADJUSTMENT OF SENTENCE UNDER THE "HOLLOWAY DOCTRINE" (UNITED STATES V. HOLLOWAY, 68 F. Supp. 3d 310 (E.D.N.Y 2014) PURSUANT TO WRIT OF AUDITA QUERELA AND/OR FED.R.CIV.P. 60 (d); EXHIBITS** |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |
| ) | |

        Defendant JOSE GUADALUPE VALENZEULA, through counsel, hereby

and herewith submits the following Supplement to his Brief of March 10, 2017,

Requesting Adjustment of Sentence Under the Holloway Doctrine (*United States v.

Holloway*, 68 F. Supp. 3d 310 (E.D.N.Y.)) pursuant to a Writ of Audita Querela

and/or Fed.R. Civ.P. 60(d).

Date:  July 10, 2017                    Respectfully submitted,

                                        /s/Matthew Lombard

                                        _____
                                        MATTHEW LOMBARD
                                        Attorney for Defendant
                                        JOSE GUADALUPE VALENZUELA

1

# I.

## INTRODUCTION AND PROCEDURAL BACKGROUND

On March 10, 2017, Defendant Jose Guadalupe Valenzuela, acting *pro se* filed his Request for Adjustment of Sentence under what has become known as the "Holloway Doctrine." In the interim, undersigned counsel was engaged to assist, and a briefing schedule was set. Through counsel, Defendant Jose Valenzuela wishes to submit for the Court's consideration the following supplementary memorandum which augments and expands on the points and authorities contained in the March 10 submission by the defendant.

As can be seen from the case number, this is a very old matter. Jose Valenzuela was arrested on August 9, 1977 for conspiracy to distribute heroin in violation of 21 U.S.C. §846, 21 U.S.C. §841(a)(1), and 18 U.S.C. §2(a). The indictment was superceded to add 21 U.S.C. §848 -- Continuing Criminal Enterprise (CCE) -- and he was tried and convicted of same in November of 1977. The CCE laws were new at the time; to our knowledge, Defendant Valenzuela was the first person in the Central District of California to be convicted under this statute. In December of 1977, he was sentenced to life in prison.

Following his conviction and sentence, Mr. Valenzuela filed an appeal, which was denied. Subsequent §2255 claims that he pursued over the years *pro se* have also all been denied.

Mr. Valenzuela has been in the custody of the Bureau of Prisons for approximately 39 years, 11 months. He was 24 years old when arrested in August of 1977. On November 25th of this year, he will turn 64.[1]

The allegations against Mr. Valenzuela are that he, along with numerous family members, spearheaded a heroin distribution network that imported the drug from

---

[1] Mr. Valenzuela was using false identification showing his age to be three years older than actual when arrested. This incorrect date of birth was adopted long ago, thus records inaccurately show Mr. Valenzuela to have been 27 at the time of his arrest; he was 24.

2

Mexico into Southern California and then distributed it to New York City, Chicago, and other metropolitan areas.  Jose Valenzuela's brothers, Fernando and Manuel Valenzuela, were convicted and received 15 and 10 years, respectively.  However, due to the generous parole practices of that era, neither of them served much beyond five years of actual custody. Of the remaining six co-defendants, most of whom also went to trial and were convicted, none served more than two years in prison and several received probation.

It is beyond argument that in their day, Jose Valenzuela and his family were significant drug dealers; although importantly, there was never any allegation of violence against Mr. Valenzuela.  Meanwhile, Mr. Valenzuela has now spent 40 years of his life in Federal prisons, more than 80% of that time in maximum security penitentiaries. He has experienced the hardest, most punishing type of confinement that exists in the Federal system.  After some serious problems, both institutionally and legally in his first ten years, he adjusted and has not had any type of disciplinary infraction or "shot" since 1986, which means 31 consecutive years of good behavior. He has matured and become a model inmate who is an active and positive influence in the lives of his children, maintains a disciplined exercise and self-education program in custody, and has sought to uplift the spirits of frightened young inmates coming into the system and give them tips on how to survive.

## II.

## PROSECUTORIAL POWERS ARE PROPERLY USED TO REMEDY INJUSTICE IN CASES WHERE CLEAR INJUSTICE EXISTS

An essential element in what has become known as the Holloway Doctrine is that it is a unique remedy which requires that the prosecution become convinced to use prosecutorial powers not simply to seek justice, but to remedy injustices when they have occurred.  Judge Gleeson in his Memorandum Regarding the Vacatur of Two Convictions in the Holloway case notes various prior situations in which the

prosecution has exercised such power,[2] and then states "The Power [the] United States Attorney...has put to use in Francois Holloway's case inheres in our adversarial system.  It is the power to seek justice even after all appeals have been exhausted and there is no question of innocence nor any defect in the sentence. Even in those circumstances, a prosecutor can do justice by the simple act of going back into court and doing what should be done."  (Amended Memo Re Order, Page 2, Lines 1-6).  Such power to remedy injustice inheres to the United States Attorney's Office and the Court in the case of Jose Guadalupe Valenzuela.

There have been many casualties in the war on drugs.  One category that courts have recently begun to recognize is that of the youthful non-violent first-time offender sentenced to an unconscionably long prison term.  Defendant Jose Guadalupe Valenzuela is a person who was young and immature when he broke the law.  He needed to be punished; he needed to be corrected; he needed for his punishment to serve as deterrence to himself and others; and he needed to be rehabilitated.

After forty years in federal prison, all of the above have been accomplished, yet action is needed to remedy the injustice of an inappropriate and excessive

---

[2] Judge Gleeson observes:  The prosecutorial power at issue here has been exercised in other cases.  For example, in *United States v. Mayo*, the government agreed to an order vacating the sentence of a defendant whom no one (not even the defendant herself) knew was pregnant at the original sentencing.  The government's agreement allowed me to resentence the defendant to a shorter prison term so the baby would not be placed in foster care.  *United States v. Mayo*, No. 05-CR-43 (E.D.N.Y.), Order, April 11, 2007, at 1, ECF No. 304 ("The government…may wish to consider joining in an application to vacate sentence under 28 U.S.C. §2255 so a new sentencing proceeding can occur."); Letter dated May 21, 2007 from AUSA Lee J. Freedman to the Court, ECF No. 309 ("[T]he government consents to the application envisioned by the Court's Order.").  More recently, and again based solely on the consent of the government, I vacated the sentence of a defendant who had cooperated with the government.  Modest adjustments in the prison term and fine on resentencing mitigated the immigration consequences of the conviction on the defendant.  *United States v. Anandani*, No. 11-CR-763 (E.D.N.Y.), Tr. October 25, 2013, at 2-3.  In both of those cases, the government refused to allow procedural impediments it had the authority to waive stand in the way of a more just sentencing."

4

sentence.  The defendant faces a term of imprisonment that extends forward from this point to the end of his days on earth, however long or brief that might be.  He faces this in spite of the fact that his crime was non-violent and did not involve weapons, that he had no prior convictions, that his co-defendants (including his older brother who was an equal or greater partner in all respects) have long since been released and allowed to resume their lives.   He faces it in spite of the fact that he has bettered himself and behaved as a model prisoner for forty years; and he faces it in spite of the fact that sentencing guidelines and changes in sentencing policy were introduced after his conviction which mean that if he had committed the same crime under the same circumstances today, he would almost certainly have received a far shorter sentence than the forty years he has already served.

According to Federal Sentencing Commission Statistics,[3] the average sentence for murder in Federal Court is 243 months.  Mr. Valenzuela, a first-time drug offender, has already served 480 months.  If he reaches a statistically normal life expectancy for a Hispanic male 64 years old today, he will eventually have served over 700 months before succumbing in prison for a crime that was non-violent and which cost all of his co-defendants far less.  If he lives to his statistical life expectancy, absent adjustment by this Court, he will have served almost three times the average sentence for murder.

In contrast, if Mr. Valenzuela committed the same crime today and were sentenced for the 65 kilograms of heroin he was accused of, his base offense level would be 36 (Guideline range 188-235 months) and even with the maximum enhancements, his sentence would likely fall far short of the 480 months he has already served -- much less the 700 months he will serve if his health allows.  In sum, an injustice clearly exists, and must be remedied.

## III.

[3] U.S. SENTENCING COMM'N, *2016 Sourcebook of Federal Sentencing Statistics*, Table 14 (2016), *available at* http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2016/sourcebook-2016.

## DEFENDANT'S INSTITUTIONAL ADJUSTMENT AND EVIDENCE OF REHABILITATION IS SUBSTANTIVE AND PROFOUND

In his *pro se* brief to the Court filed in March of this year, Defendant Jose Valenzuela presents significant evidence of his rehabilitation and his consistent exemplary and productive behavior during the past several decades of his incarceration.  Mr. Valenuzuela was not charged with a violent crime, nor has he engaged in any violence during his forty years in federal custody.  Meanwhile he has worked relentlessly to better himself, and to be a productive member of the prison society that is the world which he inhabits.  Following is a summary of Mr. Valenzuela's evolution during his forty years of confinement.

A.    Places of Confinement

Mr. Valenzuela was originally housed in Los Angeles County Jail for a month or two following his arrest in 1977, then transferred to Terminal Island where he was held throughout the trial and sentencing phase of his case. Since then, he has served time in more than a dozen Federal penal institutions.

| Location | Type of Facility | Years Housed |
|---|---|---|
| McNeil Island, Washington | U.S. Penitentiary | 1978 - 1979 |
| Lompoc, California | U.S. Penitentiary | 1979 - 1980 |
| Lewisburg, Pennsylvania | U.S. Penitentiary | 1980 - 1982 |
| Marion, Illinois | U.S. Penitentiary | 1982 - 1983 |
| Leavenworth, Kansas | U.S. Penitentiary | 1983 - 1989 |
| Lompoc, California | U.S. Penitentiary | 1989 - 2001 |
| Terminal Island, California | FCI | 2001 - 2002 |
| Petersburg, Virginia | FCI | 2002 |
| Atwater, California | U.S. Penitentiary | 2002 - 2003 |

6

| Victorville, California | FCI | 2003 - 2006 |
|---|---|---|
| Beaumont, Texas | U.S. Penitentiary | 2006 - 2008 |
| Big Sandy, Kentucky | U.S. Penitentiary | 2008 - 2012 |
| Herlong, California | FCI | 2012-Present |

B.    Disciplinary Record

Mr. Valenzuela has had only two "shots" (disciplinary infractions) in his time in custody.  The first was at Lewisburg in 1982, and the second was at Leavenworth in 1986.  Both involved testing dirty for cocaine.  He has never had a disciplinary transfer.

More seriously, though, while at Leavenworth in or around 1984 or '85, Mr. Valenzuela was apparently heard on the prison phone discussing a drug deal. This resulted in he and others being indicted in the Western District of Texas (San Antonio) on Federal charges.  He pled guilty and was sentenced to prison time of 10 years (under the old law when parole still existed) to run concurrent to his life sentence.  That sentence has long since been satisfied.

For the past 31 years, from 1986 to the present, Mr. Valenzuela has had an unblemished institutional record.  This is all the more impressive considering that most of his time has been served in U.S. Penitentiaries where the level of tension and inmate violence is much higher than in the lower and medium security institutions, and where it is therefore easier to get caught up in problems.

C.    Prison Employment and Self-Education

Mr. Valenzuela has worked consistently throughout his time in custody.  He has mostly worked in gardening, as an orderly, or in the prison commissary.  His current job at FCI Herlong is as a groundskeeper.  He has consistently taken advantage of the educational opportunities available to him.  Though he spoke only limited English when he started serving his sentence, he enrolled in prison English

7

classes and is now functionally bilingual.  He has made it a point to converse with non-Hispanic inmates in order to improve his fluency.  He has also taken all of the usual prison classes available in the higher security institutions. He has taken courses such as "Smart Money" (personal financial management), "Challenger" (psychology, behavioral skills, and anger management), and has received numerous certificates in yoga and parenting.

He has taken religion courses as well and is an observant Catholic who goes to Mass every week.

Mostly, Mr. Valenzuela has tried to better himself by extensive reading. He has read a wide selection of books, both fiction and non-fiction, in English as well as Spanish.

D.     Exercise Regimen

Mr. Valenzuela says that he exercised sporadically for his first 10 or 12 years, but about 1989, he became fanatically devoted to physical fitness and has remained so ever since.  He credits it with having helped him survive the depressing conditions that surround him, and acknowledges having become an "exercise addict" as a coping mechanism to maintain health and self-respect in difficult circumstances.

Mr. Valenzuela's daily routine consists of three hours and ten minutes of non-stop physical activity each weekday morning from 6:20 a.m. until 9:30 a.m. (he takes Saturdays and Sundays off).  In his daily work-out, he typically does 800 pushups, 300 pull-ups, hundreds of abdominal crunches, and runs for 45 minutes (5 miles or more) every day.

Though there are no longer weight piles in the Federal facilities where he has been housed, through trial and error Jose Valenzuela has taught himself isometric and parametric exercises for virtually every muscle group in the human body.  He has taught these exercises to other inmates and readily shares his expertise to help them develop training programs for themselves.  In manifold ways, he has become a

mentor to generations of new inmates coming into the Federal system, offering support and encouragement so that they can adjust emotionally to the prospect of spending the next 5, 10 or 15 years of their lives behind bars.

## IV.

## DEFENDANT VALENZUELA'S RELATIONSHIP WITH HIS FAMILY IS EXCEPTIONAL AND WARRANTS SPECIAL CONSIDERATION

Jose Valenzuela was born in Mexico in 1953, the youngest of a large number of children.  In the time he has been incarcerated, two of his sisters and one of his brothers have passed away.  Another sister has developed Alzheimer's and family members fear she is nearing the end.  Mr. Valenzuela's mother Manuela died of breast cancer in 1983, at age 73.  His father Francisco died of diabetes in 1986, at age 77.  He learned of his father's death while talking by phone with his then 9-year-old son.  Yet Mr. Valenzuela has maintained and continues to maintain uniformly close and loving relationships with all six of his grown children. They are:

- *Josefina "Josie" Valenzuela Cornejo*, age 46, (909/623-5404), resides in Chino Hills, California and works for the Best Buy electronics chain in Customer Service.  Josie has three children and is married to a firefighter with the Los Angeles Fire Department.  Her oldest son, Frankie Cornejo, age 24, is training to be a fireman like his father;

- *Jose "Joe" Valenzuela, Jr.,* 45, resides in Whittier, CA.  He is an auto mechanic who is single and has no children;

- *Alfred Valenzuela*, 44, (323/637-2957), lives in Los Angeles and works in financial services for a brokerage firm. He is married and has three children.  One of his daughters, Camille Valenzuela, recently graduated as an English major at UCLA, and is now employed as an educator with the Los Angeles Unified School District (LAUSD).  Another daughter, Kimberly Valenzuela, is majoring in Sociology and Latin American Studies at UC Santa

9

1   Barbara;

2   • *Limber Valenzuela*, 41, (619/247-6911), is a Regional Manager for the

3   Sephora retail chain which sells women's cosmetics and fragrances.

4   He is single and lives in San Diego. He received his B.A. from San

5   Diego State and his Master's in Education from Pepperdine. He taught

6   Special Education at the junior high school level for five years in the

7   San Diego public schools before going into retail management;

8   • *Joseph Valenzuela Quinn,* 39, (334/748-8949), lives in Auburn,

9   Alabama and owns a landscaping business. He has a degree from

10   Auburn University in Computer Science. Joseph was 7 days old

11   when Jose was arrested. Joseph's mother subsequently remarried to

12   a career military man who adopted him. Joseph was sixteen when he

13   met Jose for the first time;

14   • *Naylline Valenzuela*, 24, was informally adopted by Jose and his wife

15   Yolanda when she was born. She was raised by Yolanda, but visited

16   Jose in prison as often as possible. She graduated high school in 2011

17   and subsequently attended Chaffee Community College in Rancho

18   Cucamonga, CA.

19   Each of the defendant's children was impacted and scarred by the misguided

20   choices their father made as a young man. Yet each has overcome these barriers to

21   find their paths in the world, and each credits Jose's guidance and support as an

22   important part of their success.

23   Alfred Valenzuela writes:

24   In November 1977 when my father was caught and

25   sentenced to prison I had just turned four years old. My

26   mother and two slightly older siblings' life will have

27   change from that point on. Growing up without my father

28   around to do all the fun things most other families were

10

doing felt surreal.  No more camping trips, going out to the
park to ride the ponies….

The next part of my life consisted of traveling from state to
state, depending on where my father was transferred to.
Always hoping he was sent close enough where we could
see him at least once a month.  Thru all the adversity my
father was always there to encourage me to keep my head
up and focus on school and get a good education.  Even
when things at home were starting to spiral my father was
there to encourage me to look at the bright side of things.
Telling me everything would be ok.  My father is strong at
heart and it amazes me that he can still be so positive and
not have gone insane from being behind bars for over
thirty-nine years.  His passion and everything he lives for
are his kids and grandchildren.  It brings me to tears the
way he looks at my kids and it reminds me of how I was
the same kid that used to cry and would not want to leave
him when visiting hours were over.

Josie Valenzuela Cornejo recalls:

Growing up without my father was lonely and difficult
for many reasons. Fortunately I always had some kind of
contact with him writing letters or phone calls,
sometimes we would visit.  My father always told me to
hold my head up and have faith someday he would be
home . . . . My father is my hero because even when I
knew he was lonely or sad he always made us feel loved.
. . My father always told me to be a responsible person

11

1   for my actions and to learn from his mistakes to make

2   good choices to go to school work hard which I have

3   done.

4   Limber's recollections about his upbringing are particularly relevant in that

5   they show how, in spite of extraordinarily challenging circumstances, a parent-child

6   relationship with depth and meaning has been achieved.  Every time Mr. Valenzuela

7   was transferred to a new penitentiary, Limber recalls that he and his mother Yolanda

8   uprooted and moved to a new town to be close to him.  Limber and Yolanda

9   frequently shared living quarters and expenses with the wives and children of other

10  inmates housed at the same institution.

11  Limber writes:

12  I was 2 years old when my father was arrested; my first

13  memories of him have been of us in a visiting room.  My

14  mother and I followed and moved near every prison

15  where he has been, which has been over twenty different

16  prisons.  As a child, my week consisted of school

17  Monday through Friday, Saturday was visiting day where

18  we spent eight hours with my dad, and Sunday School

19  and church on Sundays.  I spoke to him by phone every

20  day of the week, and he was, and is, always involved in

21  my daily life.  This was normal life for me because it was

22  all I knew.

23

24  As normal as this life was to me, I remember growing

25  up with so many friends telling me this was abnormal.  I

26  recall my best friend from high school telling me that he

27  did not understand how I could be so close to, love so

28  much, and have such an excellent relationship with my

12

father if he was in prison and had never physically lived
with me.  I responded that even though my father was in
prison, he was aware of how I was doing in school and
how I progressed from a child to a young man, which
was different from my friend who had not spoken to his
father in six months despite living in the same house.

To this day my friends ask to speak with my dad for
advice about life, girlfriends or boyfriends, cars, and so
many things.  The thirty-nine years in prison have not
made him a bitter man; on the contrary, his positive
attitude, energy, family, and daily exercise routine keep
him from being depressed or spiteful....  I see a changed
man; he always pushed me to get an education and to be
a better person. Now that I am a professional, I see him
three to four times a year because my job is far away. My
monthly monetary support to him is, in a way, a thank
you for everything he has done for me.

Others among Mr. Valenzuela's children and grandchildren have also written
to the Court about their father and grandfather.  Perhaps most tellingly, each child
and grandchild has grown up to be a productive, contributing member of the
community.  It is a profound testimony to Jose Valenzuela's character that against
all odds and in spite of great obstacles, he has maintained a deep and meaningful
relationship and has communicated values that are seen in full manifestation in
children and grandchildren, who are descended from his own immigrant roots and
appear the embodiment of the American dream.

Kimberly Valenzuela, who is an incoming senior at UCSB and volunteers every summer with a youth gang reduction program sponsored by the City of Los Angeles, writes:

> My grandfather gave me the admiration and motivation to do well in school and to get into the great university I am now attending.  He always told me to do the best for myself and to never make the mistakes he did.  He believed in me and he was my number one fan all throughout my life…

Camille Valenzuela, Jose's granddaughter who recently graduated from UCLA and now works for LAUSD, reflects:

> Although he has not been physically with me, he has always made an effort to have a positive impact on my understanding of the world.  In every phone call, he mentions my education, asking me how I did on my last test and if I have chosen between becoming a lawyer or writer.  He encourages work ethic, honesty, and family values.  He makes life seem as if anything is possible if I work hard enough, and I admire his positivity and innate ability to see past the darkness that surrounds him and look towards a hopeful future.
>
> I sometimes wonder why he made the choices that he did.  Although he doesn't speak of it often, he did share his faults and used them as an example of what I should never do.  For a long time, I didn't think about why he was there, I just knew that this was his life.  As I grew older, I realized the gravity of his situation and the pain that came

along with it… If being unable to actually live life and
watch his family grow has been his punishment, then I
think his time in prison has fulfilled that purpose.

Jose's youngest son, Joseph Valenzuela Quinn, was raised by a mother who
soon remarried. He was adopted by his mother's new husband and was not allowed
any contact with his father. He writes:

My dad was arrested in 1977 and was taken from me
when I was just days old. I grew up knowing I had a
different father than the one who raised me, and I never
let go of that. After I was adopted, my mother did not
allow me to have any contact with my dad. In the
summer of 1993, I couldn't take the separation any
longer, and I set out to find him. I started calling the
Federal Bureau of Prisons, and the same day, I was able
to get a message to him and he was able to call me. I
will never forget the joy and happiness that I felt that
day. Second only to the birth of my son.

A week later I was going to visit my dad in Lompoc,
California. I remember feeling all the excitement of
getting to meet him for the first time. I never felt like we
had been apart for sixteen years. From the second we
embraced, it was as if we had been together all my life. I
knew there was an instant bond and connection. I could
feel his love for me and see how he was proud of me just
for being his son. I have been dreaming of the day that
he would be released since that moment. I dream of a
day when he can embrace my son and be outside of the

15

prison walls, when we can make memories as a family.

My dad did not get a chance to raise me because of the mistakes he made.  For him to be released now while his youngest grandchild is still an infant would give him the second chance he needs.  You cannot get back time lost, but to have a second chance with your family-words just cannot explain.  For me to have a chance to enjoy life with my dad and my son is a dream come true.  We all have made mistakes in life.  I know my father is truly sorry and has learned from the poor decisions he made when he was younger.  I know we have to pay a price for decisions we make, but my dad is not the same man who was arrested in 1977.  I know he would never think to go back to that same life again.

## IV.

## THE REMEDY THAT IS SOUGHT IS MODEST,
## DESERVED AND APPROPRIATE

In his decision, Judge Gleeson considered that Holloway's sentence was excessive and onerous and asked the government to consider exercising its discretion by agreeing to an order vacating two or more of Holloway's §924(c) convictions so he "could face a more just resentencing."  (Holloway, 68 F.Supp.3d at 314).  The remedy sought in the case of Defendant Jose Valenzuela is that the government agree to resentencing based on Counts 1-8, and set aside the Continuing Criminal Enterprise charge, Count 9, (21 U.S.C. §848) (Life Without Parole).  Such a resentencing would serve the ends of justice and allow the Court to hold Mr. Valenzuela fully accountable while bringing his sentence more properly into alignment with current standards, policies and guidelines, and reduce the disparity in sentencing between Mr. Valenzuela and his co-defendants as well as others similarly

1  situated in the justice system.  In so doing, the Court can achieve justice and Mr.

2  Valenzuela can achieve the second chance at life that he has amply demonstrated he

3  will neither squander nor dishonor.

4       The Court is urged to rely upon 18 U.S.C. §3661 which sets forth, "No

5  limitation shall be placed on the information concerning the background, character,

6  and conduct of a person convicted of an offense which a court of the United States

7  may receive and consider for the purpose of imposing an appropriate sentence."

8       Defendant Jose Guadalupe Valenzuela has taken responsibility for his actions,

9  he is contrite and committed to making amends, and he fully understands the

10  seriousness of his prior criminal actions.  He is intensely dedicated to his family, and

11  has proven his capacity to work steadily and hard.  In his appended letter to the

12  Court, he states:

13            It is true that forty years ago, at the time of the trial, I did

14            not take responsibility for my crime.  I truly did not think

15            about, or understand, the damage caused by selling drugs.

16            I was a young man from Culiacan, part of a family from

17            there who, like so many families from there, were involved

18            in the drug trade.  I didn't think about the consequences.  I

19            was uncaring, I was not remorseful.  All of that was true

20            back then.

21

22            Forty years is a long time.  Forty years locked up in a

23            cell is even longer.  I have had an endless amount of

24            time to think about it, and I genuinely do accept

25            responsibility for my mistakes.  The drugs I helped

26            put into the community really did hurt people.  I

27            deserve punishment and I accept punishment.  I can

28            accept the forty years that I've already spent without

17

1  feeling bitter about it.  But should my entire life be

2  consumed by prison?…

3

4  Your Honor, please read the letters from my children.

5  I have done my very best for them under these

6  horrible circumstances. I have been in touch with

7  them constantly, and have tried to help them grow

8  into good adults.  I am so very proud of them.

9

10  I offer you my solemn oath that if you are to determine

11  that the 40 years of punishment I have endured is enough,

12  I will never, ever re-offend or in any way associate with

13  anyone remotely involved in the kind of thing I did forty

14  years ago as a very young man.   I am different now.  I

15  am a grandfather, a senior citizen.  I will very soon be a

16  great grandfather.

17

18  I live with hope because I believe you will see that I have

19  paid society, and have earned the possibility of living my

20  final years in peace among my children, grandchildren,

21  and great grandchildren.

## V.

## CONCLUSION

22
23
24  The court hearing at which Jose Valenzuela was sentenced to incarceration for

25  life has now receded forty years and several generations into the past.  In the interim,

26  there have been many philosophical shifts in our country's attempts to seek

27  appropriate and effective cures for the problems of substance abuse and addiction,

28  with similar twists and turns in the laws and statutes designed to address these ills.

Different drugs have come, gone, and reemerged, yet a solution has remained elusive.

As society's approach has evolved and matured, so too has Jose Guadalupe Valenzuela, the individual.  The criminal acts that Jose committed as a young man were unacceptable and must bear consequence.  He knows and accepts it, and his family does too.  Jose has shown by his behavior that he has learned all of the appropriate lessons from this experience, and that he is not the same person that he was when he was in his twenties.

The Federally mandated aims of sentencing are set forth at 18 U.S.C. §3553(a).  The statute talks about imposing a sentence that is "sufficient, but not greater than necessary" for the sentence imposed:

(A)    to reflect the seriousness of the offense, to promote respect
       for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant;
       and

(D)    to provide the defendant with needed educational or
       vocational training, medical care, or other correctional
       treatment in the most effective manner.

It is submitted that each of the above considerations has been adequately addressed by the forty years that Jose Valenzuela has spent in the some of the toughest and most restrictive penal institutions operated by the Federal Government. "Just desserts," or retribution, has been achieved.  He has paid a steep cost for his misdeeds.  There has been deterrence, both specific (individual) to Mr. Valenzuela, who would never contemplate doing anything that would get him back in trouble if by the grace of God he is able to live in freedom for another day; and general (societal) to others, who might be tempted to follow his path.  No reasonable person could ever conclude that Mr. Valenzuela came out ahead because he served only 40

19

years of his life locked away in prison.  The issue of deterrence seems practically moot at this point, since no one in today's world has any idea who Jose Valenzuela is.  The people of his generation who were at risk of violating the law have, for the most part, already been caught and incarcerated; or have long since matured out of such behaviors; or have died or passed from the scene.  With respect to public safety (societal protection) there can be no reasonable contention that Jose Valenzuela, now in his mid-60's and with his criminal behavior decades behind him, could possibly pose a threat at this stage.  His more than thirty years of continuous and unbroken good citizenship, and his exemplary behavior in prison during that time, indicate otherwise.  And as for necessary correctional treatment or rehabilitation, Mr. Valenzuela has already profited from whatever positive aspects the Bureau of Prisons had to offer, and has largely found his own path to achieve self-betterment and redemption.  The reference to medical treatment raises the issue of the rapidly mounting costs to the BOP of caring for an aging, non-dangerous class of inmates such as the defendant.

§3553(a)(6) also talks about the need to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  Mr. Valenzuela was a first-time offender with no prior record when he was sentenced.  And while it is true that over the years other non-violent defendants have received life terms in the Federal system for drug crimes, they are a distinct minority and such draconian sentences are increasingly out of favor in the current era.

In *Koon v. United States*, 518 U.S. 81, 113 (1996) at 2047-8, a landmark decision that did not exist until nearly twenty years after Mr. Valenzuela's trial and sentencing, the Supreme Court recognized "the Federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue…."

20

Case 2:77-cr-01047-CJC   Document 67   Filed 07/10/17   Page 21 of 21   Page ID #:82

As another District Judge once observed about the sentencing process in arriving at his decision:

> "Sentencing is one of the most difficult aspects of a trial
> judge's job.  It is also the loneliest.  The extremists on one
> side or the other of the sentencing equation do not find the
> questions as difficult, and have companions along the way.
> In this particular case, it seems right to me to grant
> Feldman's Rule 35 motion."  *United States v. Feldman*, 89
> Cr. 765 (CSH), (S.D.N.Y. 1993) U.S. Dist. LEXIS 10379.

It is respectfully submitted and urged, both to this Court and to the Government, that in this particular case, at the end of the day, it seems right to grant Jose Guadalupe Valenzuela's request under the Holloway Doctrine and to resentence him to the very substantial number of years that he has already served.

Date: July 10, 2017                     Respectfully submitted,

                                        /s/Matthew Lombard

                                        _____
                                        MATTHEW LOMBARD
                                        Attorney for Defendant
                                        JOSE GUADALUPE VALENZUELA